1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11
CARRIE ARMSTRONG,                           CASE NO. CV F 10-1856 LJO JLT
12
                              Plaintiff,     **SUMMARY JUDGMENT DECISION**
13        vs.                                (Doc. 45.)

14   SHIRLEEN WRIGHT-PEARSON, et al.,

15                              Defendants.

16   _____/

17                              **INTRODUCTION**

18        Defendant California Department of Corrections and Rehabilitation ("CDCR") medical staff

19   members seek summary judgment on pro se plaintiff Carrie Armstrong's ("Ms. Armstrong's") First

20   Amendment retaliation and defamation claims as barred by immunities, limitations periods and

21   insufficient supporting facts.  This Court considered defendants' summary judgment motion on the

22   record[1] and VACATES the December 11, 2012 hearing, pursuant to Local Rule 230(g).  For the reasons

23   discussed below, this Court

24

25   ─────────────

26        [1]        This Court carefully reviewed and considered the record, including all evidence, arguments, points and
     authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
27   by the parties.  Except as otherwise noted, omission of reference to evidence, an argument, document, objection or paper is
     not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.  This
28   Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary
     judgment.  This Court does not rule on evidentiary matters in a summary judgment context, unless otherwise noted.

1

# BACKGROUND

## Summary

In 2006, Ms. Armstrong worked as a registered nurse ("RN") at CDCR's Kern Valley State Prison ("KVSP").  She claims that she was subject to retaliation for speaking out about RN's forced duties which were assigned to physicians and to defamatory statements that she appeared to be on drugs, practiced outside the scope of her RN authority, and diverted narcotics.  Defendants[2] contend that they were obligated to expose Ms. Armstrong's "unprofessional and dangerous" conduct to render defendants' immune from liability for Ms. Armstrong's claims.  Defendants further contend that Ms. Armstrong's claims are barred by limitations defenses and inability to satisfy necessary elements.

## Ms. Armstrong's CDCR Employment

During a March 27, 2006 to September 18, 2006 probationary period, CDCR employed Ms. Armstrong as an RN at KVSP to provide nursing services to inmate patients.  Ms. Doering states in her declaration that soon after Ms. Armstrong commenced employment, Ms. Armstrong called in sick without speaking to a supervisor, worked unauthorized overtime, and failed to follow her assigned work schedule and to attend mandatory training.  On April 3, 2006, Ms. Doering orally counseled Ms. Armstrong on procedures to notify supervisors of absences and to sign in and out of work.

## Unauthorized Medication Orders

Dr. Spaeth declares that when working with Ms. Armstrong, "I discovered that she wrote incorrect orders for medication and had indicated on the orders that they were approved by me.  The orders were for prescriptions that were not appropriate for the patient and I had not authorized her to write the orders."  Dr. Spaeth told Ms. Armstrong in March and April 2006 to never write an order from Dr. Spaeth unless Ms. Armstrong spoke to Dr. Spaeth.

Dr. Spaeth wrote an April 29, 2006 memorandum to nursing director Ms. Wright-Pearson to complain that Ms. Armstrong wrote unauthorized medication orders and was dishonest when Dr. Spaeth confronted Ms. Armstrong about and order Ms. Armstrong attributed to Dr. Akanno.  The memorandum

---

[2]      Defendant CDCR staff members are physicians Marta Spaeth, M.D. ("Dr. Spaeth"), Jonathan Akanno, M.D. ("Dr. Akanno"), and Ismail Patel, M.D. ("Dr. Patel"), nursing director Shirleen Wright-Pearson ("Ms. Wright-Pearson"), nurse supervisors Manjula Nair ("Ms. Nair") and Waldine Doering ("Ms. Doering"), and nurse Lourdez Villaruz ("Ms. Villaruz") and will be referred to collectively as "defendants."

states: "In the past I have stated to [Ms. Armstrong] very strongly that she is *not* to write any orders from me unless they are exactly what I have spoken to her either in person or over the phone.  I feel she exhibits poor judgment and now I am convinced that she is dishonest."  (Italics in original.)

Dr. Spaeth declares that on May 26 and 27, 2006, Ms. Armstrong wrote several medication orders "not given by me" and a "Vicodin 'renewal' that she falsely attributed to me."

Dr. Akanno declares that on June 21, 2006, Ms. Armstrong wrote several unauthorized medication orders on which "I was not contacted," and which included increasing a Gabapentin prescription and ordering Bactrim.  Dr. Akanno's August 15, 2006 memorandum to Ms. Wright-Pearson summarized the unauthorized medication orders.

Dr. Patel also discovered that Ms. Armstrong wrote unauthorized medication orders using Dr. Patel's name.  Dr. Patel discontinued an order because "the medications were inappropriate" and the "dosages were incorrect."   Dr. Patel's August 15, 2006 memorandum to Ms. Wright-Pearson summarized the unauthorized medication order.

Ms. Doering declares that in late June 2006, she orally "counseled Ms. Armstrong to stop writing orders for medication without prior authorization of a physician."

In addition, supervising nurse Ms. Nair's May 27, 2006 memorandum to Ms. Wright-Pearson outlined Ms. Armstrong's authorized medication orders and that Ms. Armstrong "has been working Out of Scope of her RN License by writing Physicians' orders without receiving a direct verbal or via telephone orders from the doctor" and that "it is highly illegal for Ms. Carrie Armstrong to work "out-of-Scope of her RN License."  Ms. Wright-Pearson declares that Ms. Nair reported that Ms. Armstrong wrote "orders for medications without prior authorization of a physician," "falsely attribut[ed] orders for medications to physicians," was orally counseled by Drs. Spaeth and Ms. Doering but "continued to write orders without prior authorization of a physician," and "wrote orders for medication with the wrong strength" and "increased the strength of a medication – all without prior authorization of a physician."

In late June 2006, Ms. Doering reported to Ms. Wright-Pearson that Ms. Doering had orally counseled Ms. Armstrong to stop writing unauthorized medication orders, that Dr. Akanno did not want Ms. Armstrong to place his name on orders, and that Dr. Akanno asked if Ms. Armstrong could be

moved "because she was making mistakes and he did not want her to use his name."

**Ms. Armstrong's Termination**

Ms. Wright-Pearson's June 28, 2006 memorandum to her supervisor KVSP Health Care Manager Sharon Zamora ("Ms. Zamora") requested Ms. Armstrong's dismissal "[d]ue to the continued issues relating to working out of her scope of practice and the potential falsification of documents by writing unauthorized prescriptions for medical care." The memorandum noted Ms. Armstrong's "practicing medicine that is not within the scope of her license" and "continued practice to ignore direction given and totake heed of supervisory direction" to put CDCR "in a vicarious liability position, as well as the potential loss of the health and safety of the inmates whom she 'administers' to."

Ms. Armstrong was reassigned to the KSVP mail room, effective July 7, 2006, and placed on administrative time off, effective July 21, 2006.

Ms. Doering completed an August 4, 2006 probationary report to rate as unacceptable Ms. Armstrong's skill, work habits and communication. The probationary report stated:

> Documentation shows that your accuracy in performing nursing responsibilities is unacceptable. You have written Physicians orders without receiving a direct verbal or telephone order. . . . Despite verbal counseling documentation shows you have continued the practice of writing physicians orders without contacting the physician. This practice is out of the scope of an RN License and is unacceptable. Documentation shows that you wrote inaccurate doses of medication and you discontinued medication prescribed by a physician.

The probationary report recommended that Ms. Armstrong not be granted permanent civil service status.

Ms. Armstrong was rejected probation, ultimately effective September 18, 2006.

**Diversion Of Narcotics At Delano Regional Medical Center**

On August 2, 2006, Lourdes Villaruz ("Ms. Villaruz"), an RN at KVSP, wrote a letter that she suspected that Ms. Armstron had diverted narcotics, including morphine, at the Delano Regional Medical Center ("DRMC") when Ms. Armstrong and Ms. Villaruz were employed as RN's at DRMC. Ms. Villaruz gave her letter to her supervisor Ms. Nair.

**Complaint To California Board Of Registered Nursing**

On September 25, 2006, Ms. Wright-Pearson filed with the California Board of Registered Nursing ("Board") a complaint of Ms. Armstrong's "illegal and unethical conduct" at KVSP. The Board complaint states:

4

1       Three different doctors (Spaeth, Akanno and Patel) provided written complaints
2   about RN Armstrong writing orders and telephone orders that they had not given and
    providing the medications to the patients by sending the prescriptions to the pharmacy
3   for filling.  In researching the situation, it was found that she had also signed doctors
    names to orders who were not on call or in the country at the time.  She had gone so far
4   as to tell one patient to stop taking his medication because it was not working.  The
    patient had a crisis for lack of using the prescribe medications.  Her practices have been
5   essentially practicing without a license and is in direct conflict with the Nurse Practice
    Act, Business and Professions Code, Section 2725.

6   **Department Of Consumer Affairs Investigation**

7       The Board referred Ms. Wright-Pearson's complaint to the California Department of Consumer

8   Affairs ("DCA") for investigation, and DCA investigator Michael Poore ("Mr. Poore") was assigned to

9   investigate.  Mr. Poore interviewed Drs. Akanno, Patel and Spaeth, Ms. Wright-Pearson and Ms. Nair,

10  who provided details of Ms. Armstrong's writing unauthorized medication orders and attributing orders

11  to KVSP physicians.  Drs. Akanno and Spaeth provided declarations to attest to their statements and

12  information provided to Mr. Poore.  Ms. Wright-Pearson and Ms. Nair provided Mr. Poore medication

13  orders, medical records and memorandums to support their statements.

14      During Mr. Poore's February 6, 2008 interview of Ms. Wright-Pearson, Ms. Wright-Pearson

15  opined that Ms. Armstron "appeared to be under the influence of drugs when she was working at KVSP

16  because she was frequently glassy-eyed and would go from hysterical to laughing in a short period of

17  time."

18      During Mr. Poore's February 6, 2008 interview of Ms. Nair, Ms. Nair stated that Ms. Armstrong

19  practiced outside the scope of her registered nurse authority by writing orders for medication without

20  obtaining a physician's advance authorization.  Ms. Nair provided Mr. Poore a copy of Ms. Villaruz'

21  August 2, 2006 letter and memorandums that Ms. Armstrong worked outside the scope of her RN

22  license.

23      Mr. Poore completed his investigation on March 6, 2008 and referred his investigative report to

24  the Kern County District Attorney's Office for consideration to prosecute Ms. Armstrong.

25  **Criminal Action Against Ms. Armstrong**

26      On July 9, 2008, the Kern County District Attorney's Office file a criminal action against Ms.

27  Armstrong in connection with Ms. Wright-Pearson's complaint to the Board.  Ms. Armstrong was

28  charged with:

5

1.      Practice of medicine without a license to violate Business and Professions Code section 2052(a);

2.      Forging a prescription to violate of Business and Professions Code section 4324(a);

3.      Procuring a controlled substance (Vicodin) by fraud, deceit or misrepresentation; and

4.      Making a false statement in a prescription to violate Health and Safety Code section 11173(b).

After a May 25, 2010 to June 1, 2010 trial, Ms. Armstrong was acquitted.

**Revocation Of Ms. Armstrong's RN License**

In April 2007, the California Justice Department initiated proceedings to revoke Ms. Armstrong's RN license based on her conduct at hospitals preceding her CDCR employment. The Board revoked Ms. Armstrong's RN license, effective November 4, 2007, based on such conduct, in particular, diversion of controlled substances and dangerous drugs, false or unintelligible record entries, illegal possession of controlled substances, and self-administration of a controlled substance to impair her ability to practice safely. The Board's January 12, 2011 decision denied Ms. Armstrong reinstatement of her RN license due to her failure to show drug treatment, recovery or rehabilitation.

**Ms. Armstrong's Claims**

On April 30, 2010, Ms. Armstrong filed her original complaint to initiate this action. Ms. Armstrong did not file a government claim with the California Victim Compensation and Government Claims Board.

Ms. Armstrong proceeds on her Third Amended Complaint ("TAC") to allege that during 2005-2006, she engaged in First Amendment protected activities when she advised CDCR agents that:

1.      CDCR nurses were "forced to write prescriptions for physicians which were outside the scope of their authority under the law";

2.       Nurses were sent "to the yard for emergencies when medical doctors were required to do so" and were forced "to see patients who should have been seen by a medical doctor";

3.      CDCR created "situations where nurses would be practicing medicine as doctors"; and

6

1    4.      A diabetic inmate did not received a required special diet.[3]

2    The TAC alleges:

3    1.      First through seventh 42 U.S.C. § 1983 ("section 1983") claims against each defendant

4            that he/she "set in motion the criminal prosecution" of Ms. Armstrong to retaliate against

5            her "exercise of her first [sic] Amendment right";

6    2.      An eighth defamation claim that Ms. Wright-Pearson "informed agents of the CDC[R],

7            including the chief medical officer, nurses, and others, that Plaintiff appeared to be on

8            drugs";

9    3.      A ninth defamation claim that Ms. Nair "informed agents of the CDC[R], including the

10           chief medical officer, nurses, and others, that Plaintiff was practicing outside the scope

11           of her authority as a nurse"; and

12   4.      A tenth defamation claim that Ms. Villaruz "informed agents of the CDC[R], including

13           the chief medical officer, nurses, and others, that Plaintiff when Plaintiff and Villaruz

14           worked at a prior employer, Plaintiff's med cart was always off count for narcotics."[4]

15                                          **DISCUSSION**

16                                **Summary Judgment Standards**

17       Defendants seek summary judgment in that the TAC's First Amendment retaliation claims lack

18   supporting facts and are barred by limitations, immunity and exhaustion defenses.

19       F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense

20   – or the part of each claim or defense – on which summary judgment is sought."  "A district court may

21   dispose of a particular claim or defense by summary judgment when one of the parties is entitled to

22   judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st

23   Cir. 1999).

24       Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

25   material fact and the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(a); *Matsushita*

26   _____

27   [3]        Defendants note that Ms. Armstrong raised these complaints in her deposition.

28   [4]        The TAC mislabels the defamation claims against Ms. Villaruz as a second "ninth" claim.

                                              7

1    *Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

2    *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary

3    judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

4    for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

5    *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

6         On summary judgment, a court must decide whether there is a "genuine issue as to any material

7    fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(a), (c); *Covey*

8    *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

9    398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

10   S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

11   1984). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

12   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

13   summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

14   S.Ct. 2505 (1986)

15        The evidence of the party opposing summary judgment is to be believed and all reasonable

16   inferences from the facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106

17   S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents

18   a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

19   prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

20        "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

21   court that there is no genuine issue of material fact." *Nissan Fire & Marine Ins. Co. v. Fritz Companies,*

22   *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*,

23   895 F.2d 563, 574 (9th Cir. 1990) *High Tech Gays*, 895 F.2d at 574. A party seeking summary judgment

24   on an affirmative defense " bears the initial burden of establishing the absence of a genuine issue of fact

25   on each issue material to his affirmative defense." *Houghton v. South*, 965 F.2d 1532, 1537 (9th Cir.

26   1992). "As to materiality, the substantive law will identify which facts are material. Only disputes over

27   facts that might affect the outcome of the suit under the governing law will properly preclude the entry

28   of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

1    "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

2    fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

3    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

4    of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

5    make the showing sufficient to establish the existence of an element essential to that party's case, and

6    on which that party will bear the burden of proof at trial.")   "But if the nonmoving party produces

7    enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."

8    *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.   "The amount of evidence

9    necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the

10   parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting

11   *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).   "The mere

12   existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*,

13   477 U.S. at 252, 106 S.Ct. 2505.

14   As discussed below, defendants eliminate factual issues and demonstrate that they are entitled

15   to judgment as a matter of law, especially considering their limitations, immunity and exhaustion

16   defenses.

17                                 **First Amendment Retaliation – Defenses**

18                                        *Limitations Defense*

19   Defendants contend the TAC's section 1983 First Amendment retaliation claims are time barred.

20   Federal civil rights statutes have no independent limitations period. *Johnson v. State of*

21   *California*, 207 F.3d 650, 653 (9th Cir. 2000); *Taylor v. Regents of the Univ. of Cal.*, 993 F.2d 710, 711

22   (9th Cir. 1993) (California's statute of limitations for personal injury actions governs claims brought

23   pursuant to 42 U.S.C. §§ 1981, 1983, and 1985)*; McDougal v. County of Imperial*, 942 F.2d 668, 673-

24   674 (9th Cir. 1991) ("suits under § 1985(3) are also best characterized as personal injury actions and are

25   governed by the same statute of limitations as actions under § 1983"); *Abreu v. Ramirez*, 284 F.Supp.2d

26   1250, 1257 (C.D. Cal. 2003).   The applicable limitations period is determined by borrowing the forum

27   state's limitations period for personal injuries. *Johnson*, 207 F.3d at 653; *Abreu*, 284 F.Supp.2d at 1257.

28   Section 1983 and related federal civil rights claims "are best characterized as personal injury actions."

*Wilson v. Garcia*, 471 U.S. 261, 280, 105 S.Ct. 1938 (1985).

On January 1, 2003, California Code of Civil Procedure section 335.1 ("section 335.1")[5] took effect to extend the prior limitations period for personal injury actions (and correspondingly to federal civil rights claims, *see Wilson*, 471 U.S. at 271-272, 105 S.Ct. 1938; *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716 (1975); *Krug v. Imbrodino*, 896 F.2d 395, 396-397 (9th Cir. 1990)), from one year under former California Code of Civil Procedure section 340(3) to two years. *Abreu*, 284 F.Supp.2d at 1255; *see* Cal. Senate Bill 688 (Burton), Stats. 2002, ch. 448, §3. Applying California law, federal civil rights claims which arise in California are generally barred if not brought within two years if they accrued after January 1, 2003. *See Johnson*, 421 U.S. 454, 95 S.Ct. 1716; *Elliot v. City of Union City*, 25 F.3d 800, 802 (9th Cir. 1994); *Krug*, 896 F.2d at 396-397; *see also Taylor*, 993 F.2d at 711.

Federal law "determines when a federal cause of action accrues, despite the fact that state law determines the relevant statute of limitations." *Wetzel v. Lou Ehlers Cadillac Group*, 189 F.3d 1160, 1163 (9th Cir. 1999); *Elliott*, 25 F.3d at 801-802. Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Tworivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996). "Generally, the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury." *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084, 1086 (9th Cir. 1991).

Just as state law determines the applicable limitations period, state law also determines the applicability of tolling doctrines in civil rights actions when it is not inconsistent with federal law. *Hardin v. Straub*, 490 U.S. 536, 109 S.Ct. 1998 (1989); *Johnson*, 207 F.3d at 653; *Abreu*, 284 F.Supp.2d at 1257.

Defendants note that they are not subject to First Amendment retaliation claims based on events occurring prior to April 30, 2008, two years prior to the filing of this action. As to Ms. Doering and Ms. Villaruz, defendants point out that First Amendment retaliation claims are time barred because:

1.    In 2006, Ms. Doering reported Ms. Armstrong to Ms. Wright-Pearson, counseled Ms.

_____

[5]    Section 335.1 provides: "Within two years: An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another."

Armstrong, provided Ms. Armstrong's unfavorable evaluations, and recommended not to grant Mr. Armstrong permanent civil service status; and

2.      In August 2006, Ms. Villaruz provided her letter to raise concerns about Ms. Armstrong's narcotics diversion at DRMC;

3.      Ms. Doering and Ms. Villaruz neither complained to the Board, provided Mr. Poore an interview, nor testified at Ms. Armstrong's criminal trial.

As to Drs. Akanno, Patel and Spaeth and Ms. Wright-Pearson and Ms. Nair, defendants point out that First Amendment retaliation claims are time barred because:

1.      Any of their alleged acts to contribute toward Ms. Armstong's criminal prosecution occurred prior to April 30, 2008 and Ms. Armstrong was on notice of such acts prior to April 30, 2008;

2.      Ms. Wright-Pearson complaint to the Board in September 2006 and was last interview in connection with her complaint on February 6, 2008;

3.      Drs. Akanno, Patel and Spaeth and Ms. Nair were interviewed by Mr. Poore on February 6, 2008;

4.      Mr. Poore completed his investigation on March 6, 2008, on which date Mr. Poore mailed Ms. Armstrong a letter to advise of the investigation and need to speak with her.

The record reflects that defendants' conduct giving rise to the TAC's First Amendment retaliation claims arose well prior to April 30, 2008 and that Ms. Armstrong had no less than constructive notice of such conduct to render the TAC's First Amendment retaliation claims accrued. The TAC's First Amendment retaliation claims are barred by the two-year limitations period.

### *Noerr-Pennington Immunity*

Defendants contend that statements by Drs. Akanno, Patel and Spaeth, Ms. Wright-Pearson and Ms. Nair to the Board are subject to the Noerr-Pennington doctrine which immunizes petitioning activity.

The Noerr-Pennington doctrine "immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000). "Noerr-Pennington immunity applies to claims under

1   42 U.S.C. § 1983 that are based on the petitioning of public authorities." *Manistee*, 227 F.3d at 1092.

2       In *Empress LLC v. City and County of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005), the

3   Ninth Circuit further explained the Noerr-Pennington doctrine:

> "The Supreme Court has described the right to petition as 'among the most precious of the liberties safeguarded by the Bill of Rights' and 'intimately connected, both in origin and in purpose, with other First Amendment rights of free speech and free press.'" *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir.2000) (quoting *United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967)). Under the Noerr-Pennington doctrine, those who petition all departments of the government for redress are generally immune from liability. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir.2000). Although the Noerr-Pennington doctrine originally immunized individuals and entities from antitrust liability, Noerr-Pennington immunity now applies to claims under § 1983 that are based on the petitioning of public authorities. *Id.* "Noerr-Pennington is a label for a form of First Amendment protection; to say that one does not have Noerr-Pennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment." *White*, 227 F.3d at 1231 (footnote omitted).

12      Defendants argue that Ms. Wright-Pearson's complaint to the Board and the statements of Drs.

13  Akanno, Patel and Spaeth, Ms. Wright-Pearson and Ms. Nair to Mr. Poore are exercise of First

14  Amendment rights.  Defendants point out that the Board regulates the practice of RN's to protect the

15  public.  Defendants fault Ms. Armstrong's failure to demonstrate that the Noerr-Pennington doctrine

16  does not apply.  *See Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir.

17  1988) ("it is important that a plaintiff's complaint contain specific allegations demonstrating that the

18  Noerr-Pennington protections do not apply").

19      The conduct of Drs. Akanno, Patel and Spaeth, Ms. Wright-Pearson and Ms. Nair in relation to

20  the Board constitutes a petition to a governmental agency to redress Ms. Armstrong nursing irregulaties

21  and threatened harm to prison health care.  As such, the Noerr-Pennington doctrine immunizes their

22  Board-related conduct to bar First Amendment retaliation claims based on such conduct.

### *Qualified Immunity*

24      Defendants invoke qualified immunity to bar the TAC's First Amendment retaliation claims

25  based on statements to KVSP management, the Board and Mr. Poore.

26      Prison officials and administrators performing discretionary functions are entitled to qualified

27  immunity from monetary liability under section 1983. *Procunier v. Navarette*, 434 U.S. 555, 561, n. 7.

28  98 S.Ct. 855 (1978).  A government official is entitled to qualified immunity "(1) if the conduct

attributed to him is not prohibited by federal law . . . or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct . . . or (3) if the defendant's action was objectively legally reasonable . . . in light of the legal rules that were clearly established at the time it was taken." *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65-66 (2nd Cir. 1999) (Citations, internal quotation marks and brackets omitted). "These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third." *X-Men Sec.*, 196 F.3d at 66.

"Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory." *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000).

Defendants argues that their "acts were in the form of speech" which lacked "threats, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action would imminently follow." Defendants point out that:

1. Ms. Villaruz reported to Ms. Nair her suspicions that Ms. Armstrong diverted narcotics at DRMC;

2. Drs. Akanno, Patel and Spaeth, Ms. Nair and Ms. Doering reported to Ms. Wright-Pearson that Ms. Armstrong wrote unauthorized medication orders, changed medication orders and gave incorrect information to patients;

3. Ms. Wright-Pearson reported to her KVSP and the Board that Ms. Armstrong acted outside her the scope of her RN license; and

4. Drs. Akanno, Patet and Spaeth, Ms. Wright-Pearson and Ms. Nair provided information and declarations to Mr. Poore.

Defendants continue that Ms. Armstrong fails to raise an issue as to constitutional deprivation given her limited claims that she complained that nurses were forced to write prescriptions and to practice medicine and treat inmates as physicians, that nurses were sent to emergencies in place of physicians, and that a diabetic inmate did not receive a required special diet. Defendants point to the

13

1  absence of evidence of Ms. Armstrong's complaints other than her "self-serving testimony." Defendants

2  argue that Ms. Armstrong's alleged complaints did not implicate the First Amendment because Ms.

3  Armstrong "spoke in the course of her official duties as an RN . . . on issues that directly affected her

4  performance of her duties."

5       Defendants are correct that the record fails to demonstrate that their alleged conduct prohibited

6  federal law.  Defendants were obligated to report and act on Ms. Armstrong's nursing irregularities and

7  to uphold inmate health care.  There is no evidence that defendants' conduct in that regard threatened,

8  coerced or intimidated Ms. Armstrong.  Nothing in the record raises an inference that Ms. Armstrong's

9  First Amendment rights were hampered.  In fact, Ms. Armstrong's claims indicate that she was not

10 restrained.  Qualified immunity further bars the TAC's First Amendment retaliation claims.

11                              ***Speech Within Course Of Official Duties***

12      Defendants futher contend the TAC's First Amendment retaliation claims fail in that Ms.

13 Armstrong's alleged complaints arose "pursuant to her official duties as an RN."

14      Many types of public employees may speak out freely on matters of public interest "without fear

15 of retaliatory dismissal." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951 (2006).  However,

16 "when public employees make statements pursuant to their official duties, the employees are not

17 speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

18 communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951.  "Restricting

19 speech that owes its existence to a public employee's professional responsibilities does not infringe any

20 liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of

21 employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at

22 421-422, 126 S.Ct. 1951.

23      Moreover, government employers are afforded "sufficient discretion to manage their operations.

24 Employers have heightened interests in controlling speech made by an employee in his or her

25 professional capacity. Official communications have official consequences, creating a need for

26 substantive consistency and clarity." *Garcetti*, 547 U.S. at 422-423, 126 S.Ct. 1951.  "When a public

27 employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to

28 speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951.

1    Defendants point out that Ms. Armstrong's "alleged complaints concerned the scope and limits

2    of her duties as an RN and patient welfare" and that Ms. Armstrong bore a "professional responsibility

3    to address concerns regarding patient care" and "to voice her concerns" about unauthorized medical

4    practice.

5    Ms. Armstrong's alleged complaints addressed her official RN duties at KVSP to entitle

6    defendants to exercise "sufficient discretion to manage their operations."  Ms. Armstrong's alleged

7    complaints no less than suggested that they were made pursuant to her employment responsibilities to

8    further doom her First Amendment retaliation claims.

9    **First Amendment Retaliation – Merits**

10   ***Elements***

11   In addition to asserting affirmative defenses, defendants attack the merits of the TAC's first

12   amendment retaliation claims.

13   "[P]ublic employees do not shed their First Amendment rights simply because they are employed

14   by the government." *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir. 2009).  "[T]he state may

15   not abuse its position as employer to stifle 'the First Amendment rights its employees would otherwise

16   enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th

17   Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  However, "while the First

18   Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize

19   the employee grievance.'" *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951 (quoting *Connick v. Myers*, 461

20   U.S. 138, 154, 103 S.Ct. 1684 (1983)).

21   To address a public employees free speech, a court seeks "a balance between the interests of the

22   [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as

23   an employer, in promoting the efficiency of the public services it performs through its employees."

24   *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968).  "[w]hen a public employee

25   speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of

26   personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in

27   which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to

28   the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

15

1    A First Amendment retaliation claim against a government employer involves a sequential

2    five-step anaylsis:

> 3         (1) whether the plaintiff spoke on a **matter of public concern**; (2) whether the
>    plaintiff spoke as a **private citizen or public employee**; (3) whether the plaintiff's
> 4    protected speech was a **substantial or motivating factor** in the adverse employment
>    action; (4) whether the state had an **adequate justification** for treating the employee
> 5    differently from other members of the general public; and (5) whether the state would
>    have taken the adverse employment action event **absent the protected speech**.

6

7    *Eng*, 552 F.3d at 1070 (bold added).

8    Ms. Armstrong bears the burden on the first three steps, but the burden then shifts to defendants

9    at the fourth and fifth steps. *Eng*., 552 F.3d at 1070-72.

10                                  Matter Of Public Concern

11    Defendants contend that Ms. Armstrong's alleged protected speech did not address a matter of

12    public concern in that it addressed a "personal grievance" as to her duties and was motivated by "her

13    desire to keep her license and her job."

14    The "essential question is whether the speech addressed matters of 'public' as opposed to

15    'personal' interest." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) Such

16    inquiry "is purely a question of law." *Eng*, 552 F.3d at 1070.  Ms. Armstaong "bears the burden of

17    showing that the speech addressed an issue of public concern," *Eng*, 552 F.3d at 1070, based on "the

18    content, form, and context of a given statement, as revealed by the whole record," *Connick*, 461 U.S. at

19    147-148, 103 S.Ct. 1684.

20    "In a close case, when the subject matter of a statement is only marginally related to issues of

21    public concern, the fact that it was made because of a grudge or other private interest or to co-workers

22    rather than to the press may lead the court to conclude that the statement does not substantially involve

23    a matter of public concern." *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir.1995)).  "When

24    speech relates both to an employee's private interests as well as matters of public concern, the speech

25    is protected if it is primarily motivated by public concern." *Altonen v. City of Minneapolis*, 487 F.3d 554,

26    559 (8th Cir. 2007).  "Motivation is gauged by evaluating the speech's content, form, and context."

27    *McCullough v. University of Arkansas for Medical Sciences*, 559 F.3d 855, 866 (8th Cri. 2009).

28    As to **content**, the speech at issue must involve "issues about which information is needed or

16

appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (internal quotation marks and citation omitted); *see Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir.1989) (describing "matter[s] of political, social, or other concern to the community" as matters of public concern). "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003) (quoting *McKinley*, 705 F.2d at 1114).

Defendants note that Ms. Armstrong's alleged complaints "arguably" relate to a matter of public concern in that they relate to inmate medical care.

As to **form** of speech, defendants note that its form helps to identify whether the speech is of a public concern. "That [the employee] expressed his views inside his office, rather than publicly, is not dispositive." *Garcetti*, 547 U.S. at 420, 126 S.Ct. 1951. However, that a limited audience weighs against a claim of protected speech. *Desrochers*, 572 F.3d at 714. "Public speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir. 2009).

Defendants point to the private nature of Ms. Armstrong's alleged complaints arising during one-on-one communications with supervisors, physicians and her union representative during nursing meetings.

As to the **context** of speech for public concern analysis, courts examine the context of the speech, particularly the point of the speech. *Desrochers*, 572 F.3d at 715. "An employee's motivation [is] relevant to the public-concern inquiry." *Gilbrook v. City of Westminister*, 177 F.3d 839, 866 (1999). "In other words, why did the employee speak (as best as we can tell)?" *Desrochers*, 572 F.3d at 715. "Does the speech 'seek to bring to light actual or potential wrongdoing or breach of public trust,' or is it animated instead by 'dissatisfaction" with one's employment situation?'" *Desrochers*, 572 F.3d at 715 (quoting *Connick*, 461 U.S. at 148, 103 S.Ct. 1684). The question of whether the speech was made to further a "purely private interest" is relevant to that inquiry as is a determination of whether the speech

was made in the context of a workplace "power struggle." *Desrochers*, 572 F.3d at 715. An additional relevant inquiry is whether the speech was precipitated by adverse employment actions. *See Desrochers*, 572 F.3d at 715. Speech "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Connick*, 461 U.S. at 148, n. 8, 103 S.Ct. 1684.

Defendants identify Ms. Armstrong's "primary interest" to retain her RN license and employment, not to speak "as a citizen on public matters." Defendants argue that although Ms. Armstrong's alleged complaints could have been a matter of public concern in different circumstances, Ms. Armstrong's private concern as to her RN license and employment does not translate to a public concern. Defendants fault Ms. Armstrong's failure to establish that her speech addressed political, social or other community concerns.

This Court shares defendants' view that Ms. Armstrong's alleged complaints fail to constitute a matter of public concern. The record reveals that Ms. Armstrong's alleged complaints promoted her personal interest to maintain her license and employment. The content and form of her alleged complaints attempt to excuse her conduct, in particular, unauthorized medication orders. There is no evidence that Ms. Armstrong aired her concerns publicly outside her employment context. There is no factual issue as to whether Ms. Armstrong's alleged complaints are a matter of public concern. They are not.

<u>Causation</u>

Defendants fault Ms. Armstrong's inability to establish that her alleged complaints were "a substantial or motivating factor in the alleged adverse actions."

To establish that speech was a substantial or motivating factor for an adverse employment action, a plaintiff must demonstrate a casual nexus between the protected speech and the alleged adverse employment action. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir.2000); *Berg v. California Horse Racing Board*, 419 F.Supp.2d 1219, 1232 (E.D. Cal. 2006). The "primary focus" is not on any possible animus directed at the plaintiff; rather, it is more specific, such as an intent to deter public comment on a specific issue of public importance. *Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1594 (1998). A plaintiff "must provide more than 'mere evidence' that the defendants were aware

of [plaintiff's] expressive conduct in order to establish a genuine material dispute as to whether retaliation was a substantial or motivating factor for their conduct." *Alpha Energy Savers, Inc. v. Hansen,* 381 F.3d 917, 929 (9th Cir. 2004). A plaintiff must produce evidence: (1) of proximity in time between plaintiff's expressive conduct and the allegedly retaliatory actions; (2) that the defendant expressed opposition to his/her speech, either to him or to others; or (3) that the defendant's proffered explanations for adverse action were false and pretextual. *Alpha Energy Savers*, 381 F.3d at 929; *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). A plaintiff cannot demonstrate a casual nexus if the same adverse employment actions occurred before and after he/she engaged in protected speech. *Berg*, 419 F.Supp.2d at 1232.

Defendants point to the absence of evidence that defendants:

1. Were aware of Ms. Armstrong's alleged complaints/protected speech when the Board complaint was filed;

2. Expressed opposition to her alleged complaints/protected speech; and

3. Proffered false or pretextual reasons for their actions.

Defendants characterize their actions as legitimate and necessary to fulfill their duty to expose Ms. Armstrong's unprofessional and dangerous conduct.

Defendants are correct that the record raises no factual issues that Ms. Armstrong's alleged protected activity was a substantial or motivating factor for defendants' alleged First Amendment retaliation. Given the evidence of Ms. Armstrong's recklessness, no factual issues arise as a casual nexus between her alleged complaints and alleged adverse action. No evidence demonstrates defendants' intent to deter public comment on an issue of public importance or defendants' opposition to Ms. Armstrong's alleged complaints. Nothing demonstrates proximity between Ms. Armstrong's alleged complaints and alleged retaliatory actions. The evidence reflects Ms. Armstrong's recklessness to warrant defendants' actions to address it.

In addition, defendants exercised neither influence or control over the Board's investigation of Ms. Wright-Pearson's complaint. The record reveals that Ms. Wright-Pearson merely filed the complaint and that the Board proceeded to investigate.

The record further reflects probable cause for the criminal action against Ms. Armstrong.

19

1    "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of

2    which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of

3    reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. U.S.*, 338

4    U.S. 160, 175, 69 S.Ct. 1302 (1949). "The fact that an innocent explanation may be consistent with the

5    facts alleged, however, does not negate probable cause." *U.S. v. Fama*, 758 U.S. 834, 838 (2nd Cir.

6    1985). Similar to the Board's investigation, there is no evidence that defendants participated in the

7    decision to file a criminal action against Ms. Armstrong. The trial court in the criminal action conducted

8    a preliminary hearing and determined probable cause existed to charge Ms. Armstrong. "The magistrate

9    making the original determination of probable cause is accorded significant deference by the reviewing

10   court." *United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1996), *cert. denied*, 520 U.S. 1236, 117

11   S.Ct. 1836 (1997).

12        Moreover, Ms. Armstrong's acquittal in the criminal action fails to support the TAC's First

13   Amendment retaliation claims. Aa "jury cannot be said to have 'necessarily rejected' any facts when

14   it returns a general verdict of not guilty." *U.S. v. Watts*, 519 U.S. 148, 155, 117 S.Ct. 633 (1997). An

15   acquittal does not "prove that the defendant is innocent; it merely proves the existence of a reasonable

16   doubt as to his guilt." *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct.

17   1099 (1984). The acquittal is unavailing to support that Ms. Armstrong's alleged complaints were a

18   substantial or motivating factor for adverse action.

19                                    Adequate Justification

20        Defendants contend that safeguarding inmate-patients justified their actions given Ms.

21   Armstrong's dangerous conduct and its potential harm. To support their justification, defendants point

22   to revocation of Ms. Armstrong's RN license. The record supports that defendants' adequate

23   justification for handling of Ms. Armstrong under the circumstances.

24                             Same Action In Absence Of Protected Speech

25        Defendants note that they would have taken the same actions absent Ms. Armstrong's alleged

26   protected speech because she endangered inmate-patients. Nothing in the record suggests otherwise.

27        In sum, Ms. Armstrong fails to carry her burden on the matter of public concern, private citizen

28   and causation factors whereas defendants carry their burden on the adequate justification and same action

factors to entitle defendants to summary judgment on the TAC's First Amendment retaliation claims.

## Defamation – Defenses

### Failure To Exhaust Administrative Remedies

Defendants argue that the TAC's defamation claims are barred by Ms. Armstrong's failure to exhaust administrative remedies pursuant to the California Government Claims Act ("Claims Act"), Cal. Gov. Code, §§ 810, et seq.

The Claims Act describes the specific steps which must be taken before a civil action for money or damages may be brought against a public entity. *Addison v. State of California*, 21 Cal.3d 313, 316, 146 Cal.Rptr. 224 (1978). The Claims Act requires timely filing of a proper claim as condition precedent to maintenance of an action. Cal. Gov. Code, §§ 905, 911.2, 945.4 (presentment of a written claim to the applicable public entity is required before a "suit for money or damages may be brought against a public entity"); *County of San Luis Obispo v. Ranchita Cattle Co.*, 16 Cal.App.3d 383, 390, 94 Cal.Rptr. 73 (1971). California Government Code section 911.2(a) provides: "A claim relating to a cause of action for death or for injury to person . . . shall be presented . . . not later than six months after the accrual of the cause of action. A claim relating to any other cause of action shall be presented . . . not later than one year after the accrual of the cause of action."

The claims procedures applicable to actions against public entities are the same for actions against public employees. Cal. Gov. Code, §§ 950-950.6. A "government claim must be filed with the public entity before a tort action is brought against the public entity or public employee." *Watson v. State of California*, 21 Cal.App.4th 836, 844, 26 Cal.Rptr.2d 262 (1993) (1993) (citing Cal. Gov. Code, § 950.2). A claim against a state employee must be presented to the Victim Compensation and Government Claims Board ("Government Claims Board"). *See* Cal. Gov. Code, §§ 905.2, 945.4.

Compliance with the claims statutes is mandatory. *Farrell v. County of Placer*, 23 Cal.2d 624, 630, 145 P.2d 570 (1944). Failure to file a claim is fatal to the cause of action. *Johnson v. City of Oakland*, 188 Cal.App.2d 181, 183, 10 Cal.Rptr. 409 (1961). "Failure to allege facts in a complaint demonstrating or excusing compliance with prelitigation governmental claims presentation requirements of the Tort Claims Act subjects the complaint to a motion to dismiss for failure to state a cause of action." *Comm. for Immigrant Rights of Sonoma County v. County of Sonoma,* 644 F.Supp.2d 1177,

1205 (2004).   A "plaintiff must allege facts demonstrating or excusing compliance with the claim

presentation requirement."   *State v. Superior Court*, 32 Cal.4th at 1243, 13 Cal.Rptr.3d at 534.

"Accordingly, submission of a claim within [six months] is a condition precedent to a tort action against

either the employee or the public entity."   *Williams v. Horvath*, 16 Cal.3d 834, 838,129 Cal.Rptr. 453

(1976).

"[N]o suit for money or damages may be brought against a public entity on a cause of action for

which a claim is required to be presented . . . until a written claim therefor has been presented to the

public entity and has been acted upon . . . or has been deemed to have been rejected."   Cal. Gov. Code,

§ 945.4.   The Claims Act is designed to protect governmental agencies from stale and fraudulent claims,

to provide an opportunity for timely investigation, and to encourage settling meritorious claims. *Johnson*

*v. San Diego Unified School Dist.*, 217 Cal.App.3d 692, 697, 266 Cal.Rptr. 187 (1990).   The "claims

statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances

surrounding the claim."   *Shelton v. Superior Court*, 56 Cal.App.3d 66, 82, 128 Cal.Rptr. 454 (1976).

Since the claims statutes should not be used as traps for the unwary when their underlying purposes have

been satisfied, courts employ a test of substantial compliance, rather than strict compliance, in

determining whether the plaintiff has met the filing requirements of the Claims Act.   *Johnson*, 217

Cal.App.3d at 697, 266 Cal.Rptr. 187.   Nonetheless, the substantial compliance doctrine "cannot cure

total omission of an essential element from the claim or remedy a plaintiff's failure to comply

meaningfully with the statute."   *Loehr v. Ventura County Community College Dist.,* 147 Cal.App.3d

1071, 1083, 195 Cal.Rptr. 576 (1983).

There is no dispute that Ms. Armstrong failed to file a Claims Act claim with the Government

Claims Board.   The record reflects that Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz acted within

their KVSP employment at the time of their challenged acts to necessitate Claims Act compliance.   "For

the purpose of the claim statute, a public employee is acting in the course and scope of his employment

when he is engaged in work he was employed to perform or when the act is an incident to his duty and

was performed for the benefit of his employer and not to serve his own purposes or conveniences."   *Neal*

*v. Gatlin*, 35 Cal.App.3d 871, 875, 111 Cal.Rptr. 117 (1973) (citation and quotation marks omitted).

Defendants are corrects that Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz acted within their KVSP

1 employment "because their statements were incident to their duties as Rns and were made for the benefit
2 of inmate-patients."

3      Ms. Armstrong's failure to satisfy Claims Act requirements bars the TAC's defamation claims.

4 *California Civil Code Section 47(b) Immunity*

5      Defendant contend that the TAC's defamation claims are barred by California Civil Code section
6 47(b) ("section 47(b)"), which renders privileged a communication in a "judicial proceeding," "in any
7 other official proceeding authorized by law" or "in the initiation or course of any other proceeding
8 authorized by law."

9      The section 47(b) privilege is referred to as "absolute" in that "it bars all tort causes of action
10 except a claim for malicious prosecution." *Hagberg v. California Federal Bank FSB*, 32 Cal.4th 350,
11 360, 81 P.3d 244 (2004). The section 47(b) privilege "is absolute; it applies, if at all, regardless whether
12 the communication was made with malice or the intent to harm." *Kashian v. Harriman*, 98 Cal.App.4th
13 892, 913, 120 Cal.Rptr.2d 576 (2002). Put another way, application of the privilege does not depend
14 on the publisher's "motives, morals, ethics or intent." *Silberg v. Anderson*, 50 Cal.3d 205, 220, 266
15 Cal.Rptr. 638 (1990).

16      The "absolute privilege established by section 47(b) serves the important public policy of
17 assuring free access to the courts and other official proceedings." *Hagberg*, 32 Cal.4th at 360, 81 P.3d
18 244. It is intended to "assure utmost freedom of communication between citizens and public authorities
19 whose responsibility is to investigate and remedy wrongdoing." *Silberg*, 50 Cal.3d at 213, 266 Cal.Rptr.
20 638.

21      Defendants characterize the Board's investigation of Ms. Armstrong as quasi-judicial
22 administrative and official proceeding authorized by law in that the Board investigates and disciplines
23 Rns who engage in unsafe activities. Defendants note that Ms. Wright-Pearson and Ms. Nair's
24 statements and providing information to Mr. Poore addressed the Board's investigation into Ms.
25 Armstrong's fitness and competency. Defendants further note that prior to Ms. Wright-Pearson's and
26 Ms. Nair's contacts with Mr. Poore's, Ms. Armstrong's license had been revoked based on her conduct
27 at DRMC.

28      Defendants demonstrate that section 47(b) bars the TAC's defamation claims. Applying the

section 47(b) privilege here serves it purpose to promote communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing.

### California Civil Code Section 43.8 Privilege

Defendants further seek to invoke immunity under California Civil Code section 43.8 ("section 43.8") which shields from monetary liability communications to a healing arts licensing board.  The section 43.8 privilege is qualified and does not protect malicious conduct.  Cal. Civ. Code, § 43.8(c). With the qualified section 43.8 privilege, the defendant bears the initial burden to demonstrate that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff bears the burden to prove that defendant made the statement with malice. *Hassan v. Mercy American River Hosp.*, 31 Cal.4th 709, 718, 74 P.3d 726 (2003).  The section 43.8 privilege "may be defeated by proof that the person or entity asserting the privilege, when it made the communication, knew the information was false or otherwise lacked a good faith intent to assist in the medical practitioner's evaluation." *Hassan,* 31 Cal.4th at 724, 74 P.3d 726.

Defendants contend that Ms. Wright-Pearson's and Ms. Nair's statements to Mr. Poore are subject to section 43.8 protection in that they were made during an administrative and criminal investigation into Ms. Armstrong's illegal conduct and related to Ms. Armstrong's fitness as an RN. Defendants further invoke the section 43.8 immunity for Ms. Wright-Pearson's, Ms. Nair's and Ms. Villaruz' internal KVSP internal communications leading to the Board complaint in that such communications addressed Ms. Armstrong's "unprofessional and dangerous practices."

Section 43.8 immunity further bars the TAC's defamation claims.  The conduct attributed to Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz assisted in evaluation of Ms. Armstrong's fitness as an RN. The record reveals no facts to suggest Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz knew their communications were false or lacked a good faith intent and thus not malice to avoid application of the section 43.8 privilege.  Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz are entitled to section 43.8 protection to further defeat the TAC's defamation claims.

### California Civil Code Section 47(c) Privilege

Defendants contend that the common interest privilege of California Civil Code section 47(c) ("section 47(c)") bars the TAC's defamation claims.

1    Section 47(c) subjects to privilege:

2           . . . a communication, without malice, to a person interested therein, (1) by one
     who is also interested, or (2) by one who stands in such a relation to the person interested
3    as to afford a reasonable ground for supposing the motive for the communication to be
     innocent, or (3) who is requested by the person interested to give the information. This
4    subdivision applies to and includes a communication concerning the job performance or
     qualifications of an applicant for employment, based upon credible evidence, made
5    without malice, by a current or former employer of the applicant to, and upon request of,
     one whom the employer reasonably believes is a prospective employer of the applicant.
6    This subdivision authorizes a current or former employer, or the employer's agent, to
     answer whether or not the employer would rehire a current or former employee.

7

8    The section 47(c) privilege applies "where the communicator and the recipient have a common

9    interest and the communication is of a kind reasonably calculated to protect or further that interest."

10   *Deaile v. General Telephone Co. of California*, 40 Cal.App.3d 841, 846, 115 Cal.Rptr. 582 (1974).

11   However, "if malice is shown, the privilege is not merely overcome; it never arises in the first instance."

12   *Brown v. Kelly Broadcasting Co.*, 48 Cal.3d 711, 723, n. 7, 257 Cal.Rptr. 708 (1989).

13   Defendants argue that Ms. Villacruz' communications as to her suspicions of Ms. Armstrong's

14   narcotics diversion at DRMC are shielded by the section 47(c) privilege given the mutual interests of

15   KSVP nursing staff to avoid narcotics diversion at KSVP and to ensure inmate-patient safety.

16   Defendants are correct that the section 47(c) privilege provides another layer of protection for

17   communications to promote mutual health and safety interests.

18                                **Defamation – Merits**

19                                      *Elements*

20   Defendants challenge the TAC's defamation claims in the absence of supporting facts.

21   Defamation is an invasion of the interest in reputation. *Ringler Associates Inc. v. Maryland Cas.*

22   *Co.*, 80 Cal.App.4th 1165, 1179, 96 Cal.Rptr.2d 136 (2000). "The tort of defamation involves (a) a

23   publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to

24   injure or that causes special damage." *Taus v. Loftus*, 40 Cal.4th 683, 720, 151 P.3d 1185 (2007)

25   (internal quotations and citations omitted). An essential "is that the publication in question must contain

26   a false statement of fact." *Gregory v. McDonnell Douglas Corp.*, 17 Cal.3d 596, 600, 131 Cal.Rptr. 641

27   (1976).

28                                     *Opinions*

                                          25

1    Defendants characterize communications attributable to Ms. Wright-Pearson and Ms. Villaruz

2   opinion, not fact.

3    "It is an essential element of defamation that the publication be of a false statement of fact rather

4   than opinion." *Ringler Associates Inc. v. Maryland Cas. Co.*, 80 Cal.App.4th 1165, 1180, 96

5   Cal.Rptr.2d 136 (2000). "Under the First Amendment there is no such thing as a false idea. However

6   pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries

7   but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-340, 94 S.Ct.

8   2997 (1974) (footnote omitted). "In this context courts apply the Constitution by carefully distinguishing

9   between statements of opinion and fact, treating the one as constitutionally protected and imposing on

10  the other civil liability for its abuse. . . . The critical determination of whether the allegedly defamatory

11  statement constitutes fact or opinion is a question of law." *Gregory v. McDonnell Douglas Corp.*, 17

12  Cal.3d 596, 601,131 Cal.Rptr. 641 (1976).

13   Defendants characterize Ms. Wright-Pearson's and Ms. Villaruz' comments as to drug use and

14  diversion as opinion, not fact. Defendants argue that statements attributable to Ms. Wright-Pearson and

15  Ms. Villaruz were not "affirmative."

16   Statements attributable to Ms. Wright-Pearson and Ms. Villaruz address their observations and

17  suspicions and are not concrete facts. This Court construes Ms. Armstrong's lack of meaningful

18  opposition as her concession that the statements are non-actionable opinions.

19                                            ***Falsity***

20   Defendants further challenge the TAC's defamation claims in the absence of facts of falsity of

21  statement attributable to Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz. Defendants fault Ms.

22  Armstrong's failure to raise factual issues as to falsity of statements that Ms. Armstrong worked outside

23  the scope of her RN license and of physician complaints as to Ms. Armstrong unauthorized medication

24  orders.

25   Defendants are correct that in the absence of factual issues as to the falsity of alleged defamatory

26  statement, the TAC's defamation claims fail. As such, Ms. Wright-Pearson, Ms. Nair and Ms. Villaruz

27  are entitled to summary judgment on the TAC's defamation claims.

28                                   **CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

    1.    GRANTS defendants summary judgment;

    2.    DIRECTS the clerk to grant judgment in favor of defendants and against plaintiff Carrie Armstrong; and

    3.    VACATES the January 29, 2013 pretrial conference and March 12, 2013 trial.

IT IS SO ORDERED.

**Dated:**   **November 30, 2012**       **/s/ Lawrence J. O'Neill**
                                                UNITED STATES DISTRICT JUDGE